## Commonwealth ex rel. Bruno v. Rundle

*H. A. Cantor,* for relator.

*H. Randolph,* for respondent.

WEINROTT, J., September 14, 1964.—How far are the echoes of "Gideon's Trumpet" [1] to reach? That, in essence, is the question before us in this case and in the spate of allied habeas corpus applications now pending in our court.[2]

Underlying that question and influencing the answer to it, perhaps, is another of even wider import: How far must the constitutional provisions be drawn for the protection of accused criminals in disregard of the rights and safety of the almost 200,000,000 law-abiding citizens of our Nation who are increasingly threatened by criminal depredation?

On March 18, 1963, in the epochal ruling of Gideon v. Wainwright,[3] the United States Supreme Court upset the trial and conviction of an indigent accused felon and declared that the refusal of a Florida State court to appoint counsel for him had violated his constitutional rights. In so declaring, the court expressly overruled its view of 21 years earlier, in Betts v. Brady, 316 U. S. 455 (1942), that only under special circumstances need a State court supply a lawyer for an accused criminal.

Then on May 18, 1964, came Massiah v. United States, 377 U. S. 201. In that case, enforcement agents arranged for an indicted man to be driven with a codefendant in a car secretly wired for recording con-

---

[1] With acknowledgments to Anthony Lewis, author of the recent book of that title telling the story of Gideon v. Wainwright, 372 U. S. 335 (1963).

[2] As well as in countless courts elsewhere, not to mention the deluge of petitions to be anticipated hereafter.

[3] Supra, Note 1.

versations. The accused man had an attorney, but, of course, the attorney was not in the car. The use at trial of incriminating statements thus made in the absence of counsel was held to be illegal. Certainly, officers arranging for such a ride cannot have a lawyer along to curb the client's candor.

On June 22, 1964, followed Escobedo v. Illinois, 378 U. S. 478. There, a murder suspect had been arrested, released on a habeas corpus and rearrested. Subsequently questioned by police, he asked for his lawyer but was told his lawyer did not want to see him. Meanwhile, his lawyer was denied access to his client. A confession obtained under such circumstances, the Supreme Court said, even though before indictment and trial, could not be used against the suspect.

On the same day, in Jackson v. Denno, 378 U. S. 368, the court, by a five-to-four decision, held unconstitutional the New York procedure which permitted the same jury that determines guilt to determine whether a confession was voluntary or coerced. Eleven years before, in Stein v. New York, 346 U. S. 156 (1953), which the court now overruled, the court had upheld that precise practice.[4]

Such decisions evidence clearly the trend in our Nation's highest court toward ever greater protection of suspected criminals, with apparently small consideration for the frustration of police in the solving of crimes and the conviction of criminals, as well as for the welfare of the great mass of the public subjected 24 hours of each day to violence, thievery and other criminal behavior, the rate of which has continued to rise alarmingly.

---

[4] Worthy of mention also is Mapp v. Ohio, 367 U. S. 643, (1961), excluding from evidence obscene literature seized in a search without a clear warrant. That holding overruled the 1949 case of Wolf v. Colorado, 338 U. S. 25, to the contrary.

The trend has not gone without comment in the high court itself. Dissenting from the majority in Escobedo v. Illinois, supra, Justice Byron R. White, who as a former Attorney General had concrete prosecuting experience behind him, objected, 378 U. S. 495:

"The decision is thus another major step in the direction of the goal which the Court seemingly has in mind —to bar from evidence all admissions obtained from an individual suspected of crime, whether involuntarily made or not."

The dissenting Justice warned further: 378 U. S. 499:

"I do not suggest for a moment that law enforcement will be destroyed by the rule announced today. The need for peace and order is too insistent for that. But it will be crippled and its task made a great deal more difficult, all in my opinion, for unsound, unstated reasons, which can find no home in any of the provisions of the Constitution."

And in a bitter dissent from the bare majority of one in Jackson v. Denno, supra, Justice Hugo L. Black forecast:

"Today's holding means that hundreds of prisoners in the State of New York have been convicted after the kind of trial which the Court now says is unconstitutional. The same can fairly be said about prisoners convicted in at least 14 other States listed in the Appendix A-II to this opinion . . . Certainly if having the voluntariness of their confessions passed on only by a jury is a violation of the Fourteenth Amendment, as the Court says it is, then not only Jackson but all other . . . prisoners already convicted under this procedure are, under our holding in Fay v. Noia, 372 U. S. 391, entitled to release unless the States . . . are still willing and able to prosecute . . . The disruptive effect which today's decision will have on the administration of criminal justice throughout the country

will undoubtedly be great. Before today's holding is even a day old the Court has relied on it to vacate convictions in 11 cases from Arizona, Pennsylvania, Texas, New York, and the District of Columbia." [5]

Our immediate problem in the case at bar, and in the allied cases referred to, is not concerned with the use of confessions, but with the need to appoint counsel under the Gideon rule. The "disruptive effect . . . on the administration of criminal justice" of which Justice Black spoke has already reached immeasurable proportions. Cases 20 or 30 years old must be retried, and enforcement officials will find it impossible in thousands of cases to locate witnesses. Criminals usually are younger than their victims. The criminal lives to seek release by habeas corpus; the victim dies. Hence, in untold instances, the Gideon ruling, applied to prisoners already in jail, many of whom are recidivists, must bring not their retrial but their complete release, often to resume their crimes against the rest of society.

Florida, to which the Supreme Court remanded 30 cases for reconsideration "in light of Gideon v. Wainwright," already has demonstrated that outcome. Finding it impossible to retry a huge number of long-standing cases affected by the Gideon principle, the courts of that State released nearly a thousand convicts outright.[6]

Sixteeen years before, Justice Felix Frankfurter had warned that the extension of a rule requiring counsel to men already in jail "would furnish opportunities hitherto uncontemplated for opening wide the prison doors of the land." [7] The wholesale jail-deliveries in

---

[5] Justice Black cites those cases, including two from Pennsylvania, in a footnote (32 L. W. at 4361).

[6] See Lewis, op. cit., Note 1, page 205.

[7] Foster v. Illinois, 332 U. S. 134, at page 139 (1947).

Florida bear out his prediction. During the argument of the Gideon case Florida's attorney general pleaded in line with the view of Justice Frankfurter that if the court proposed to reverse its earlier view [8] denying a general right of representation in State criminal trials, it should restrict its reversal to future trials. In accepting and granting the "petition" pencilled by farmhand Clarence Earl Gideon in his Florida prison, the court, though it did not expressly declare its ruling to be retroactive, at the same time ignored the request for a prospective restriction.

In the wake of its ruling, the court remanded more than 40 cases, including the 30 to Florida, to State courts "for further consideration" of prior convictions "in light of Gideon v. Wainwright." See, for example, three cases remanded to Pennsylvania, Weigner v. Russell, 372 U. S. 767 (1963) ; Garner v. Pennsylvania and Vecchiolli v. Maroney, 372 U. S. 768 (1963).[9] Our State courts have interpreted that action to mean that Gideon v. Wainwright does look backward, and does apply without limitation even to long-term offenders who entered their cells many years ago: Commonwealth ex rel. McCray v. Rundle, 415 Pa. 65, (decided July 1, 1964, and reversing 202 Pa. Superior Ct. 224, 195 A. 2d 835) ; Commonwealth ex rel. Goodfellow v.

---

[8] In Betts v. Brady, 316 U. S. 455 (1942). Betts recognized, however, that special circumstances (such as mental incompetence) might call for counsel in a particular case.

[9] The Veschiolli case is one with which we happen to be personally familiar. Obeying the command from Washington, our State Supreme Court remanded the case to the Common Pleas Court for a hearing on the habeas corpus petition—with counsel to represent the petitioner—and for proceedings in due course thereafter. We vacated the plea of guilty and the sentence, with leave to the district attorney to put the case down for trial. It was relisted last October 30. The result was another guilty plea, but sentence was suspended by President Judge Vincent A. Carroll, to whom the trial had been assigned.

Rundle, 203 Pa. Superior Ct. 419, (June 23, 1964);
Commonwealth ex rel. Davis v. Rundle, 203 Pa. Superior Ct. 451, (June 24, 1964).

First-hand observation in the trial courts discloses a constant stream of accused criminals flowing through those courts, the enormous bulk of crimes unceasingly being committed, and the stultifying restrictions shackling police and prosecutors in obtaining and presenting the truth in court so that proper penal measures may be imposed. Law enforcement officers, including the policeman patrolling his "beat", must now endeavor to master the technicalities and legalities of obtaining evidence as well as apprehending criminals. The issue of the means and manner of securing evidence now permeates and makes more complex most trials. Post-trial tests of the validity of the trial must also embrace these complexities, as well as such measures and practices as may later be changed and deemed essential to fundamental due process by our highest appellate courts.

The deterrent effect to be gained from swift and certain punishment has been utterly destroyed. Collateral attacks on judgments of sentence have become so numerous that additional staffs are necessary to process them. "Prison lawyers" have developed who prepare petitions for other prisoners for writs of habeas corpus, coram nobis and other proceedings in an effort to overturn their convictions. We are aware that the court was, to some extent, conscious of the repercussions that might ensue from Gideon; we are told [10] that even retired Justice Frankfurter replied to an inquirer afterward that, if he had sat on the case, he would have agreed with its ruling; but we cannot believe that the court could possibly have comprehended in advance the overwhelming deluge of habeas corpus

[10] By Mr. Lewis, op. cit., Note 1.

applications that were bound to follow [11] or the havoc the decision was certain to wreak among the plagued and puzzled lower courts of our country. Hence, a visit to some of those courts would surely prove enlightening, and might at least slow the apparently inexorable march of rulings protecting the criminal at the expense of society.

The trumpet of Gideon,[12] nevertheless, has resounded throughout the land, and no matter how much we may shrink inwardly from the harshness of its blast, we are bound to obey it. Yet, we have a small consolation; this court did not make the decision nor need we enlarge it. Hence, it is our purpose here to examine, as closely as we may, the limits of the decision, and to confine ourselves with the utmost possible strictness within those limits.

Narrowed to its essential confines, Gideon v. Wainwright extended to State tribunals the mandate of the sixth amendment entitling accused criminals to legal representation, and declared specifically that an indigent defendant, convicted of felony, whose request for court-appointed counsel at his trial had been denied, was thereby deprived of his constitutional rights.

[11] From prisons around the country are pouring petitions ranging from the careful model prepared by an ex-judge without compensation in the case at bar to the semi-literate screed handwritten by a "jailhouse lawyer" for a "fee" of cigarettes. As an indication of their volume, we have counted in the United States Shepard up to July, 1964, a total of nearly 400 reports in perhaps half our State and Federal jurisdictions citing the Gideon case. Doubtless there are a host of other actions not citing that case and hence not to be found in Shepard, or not yet decided and hence not reported. It is likely that many convicts of long standing, either aware of the Florida jail-delivery or anticipating the death or disappearance of adverse witnesses, are scrawling their "petitions" in the hope that they too will be "sprung" (to borrow a prison expression) without having to undergo the risk of a retrial.

[12] Again with acknowledgments to Mr. Lewis.

Unanswered was the problem of the stage at which counsel becomes necessary. Is it only at the trial itself, which was the Gideon situation? Or did the logic of the decision extend to arrest, preliminary hearings, to motions for new trial, to appeals, to applications for parole or for revocation of parole or probation, to habeas corpus proceedings themselves, regardless how numerous or repetitious? All might possibly affect a man's liberty. The Escobedo case, supra, might possibly be interpreted as requiring a general appointment of counsel at early stages before trial. If so interpreted, it is even conceivable that complete safety might require the lawyer to accompany his client at the earliest possible stage, the moment of arrest or interrogation, if it precedes arrest.

Gideon was a felony case; does its reasoning nevertheless apply to lesser offenses? Should an indigent drunk sentenced to the House of Correction by a magistrate be given a lawyer? Should the motorist haled into traffic court, the violator of the city's housing code, the husband brought in for nonsupport?

Finally, where should the courts recruit the army of lawyers for the stampeding defendants? How should that army be paid? Or should the entire bar, including the $100-an-hour corporation specialist and others who may recoil in horror from the criminal courts, be requested to volunteer without pay? Moreover, how many lawyers are experienced in the trial and handling of a criminal case and criminal procedure generally?

Limiting the effect of Gideon as we intend, we do not propose to extend its reasoning to pretrial situations. Our Superior Court has ruled recently that to require the assignment of counsel at a preliminary hearing before a magistrate "would be an unwarranted extension of . . . Gideon v. Wainwright": Commonwealth ex rel. Land v. Rundle, 202 Pa. Superior Ct. 509, 511, 198 A. 2d 433 (1964). See, also, Common-

wealth ex rel. Herge v. Rundle, 415 Pa. 36 (1964). We do not interpret either the Massiah or the Escobedo case as flat authority for compelling the appointment of counsel in noncapital cases before trial. Of course, to be effective, a lawyer who is to defend an accused criminal should be appointed not at the last moment; he should be named sufficiently in advance to permit adequate investigation and preparation.

It has been ruled that legal representation is necessary on direct appeal: Douglas v. California, 372 U. S. 353 (1963). It is our view that the principle applies with equal logic to motions for new trial and other post-trial motions basic to such direct appeal.

It does not apply, however, to habeas corpus proceeding themselves. In the Vecchiolli case, supra, our State Supreme Court, in remanding the case, directed that counsel be appointed;[13] but we do not regard that as the enunciation of a general rule. On the contrary, that court has expressly declared:

"We know of no legal or constitutional requirement that counsel be appointed to represent individuals who institute actions in habeas corpus": Commonwealth ex rel. Dickerson v. Rundle, 411 Pa. 651, 192 A. 2d 419 (1963).

We find no case commanding the appointment of counsel at a proceeding for parole or probation or for the revocation of either. It is our view that none is required.

As for cases involving offenses less than felonies, until we are faced with a definitive ruling extending the Gideon principle, we shall adhere to the opinion that attorneys are not imperative for such cases.

Years ago, our highest court ruled that the right to counsel might be voluntarily waived, provided the waiver was competent and intelligent: Johnson v.

---

[13] See Note 9.

Zerbst, 304 U. S. 458 (1938). Our own Supreme Court has recently amplified the criteria for such waiver to require full knowledge of the nature of the charges, of statutory offenses included within them, of possible punishments, of possible defenses and mitigation, and of all other facts essential to a broad understanding of the entire situation: Commonwealth ex rel. McCray v. Rundle, supra. The stringency of those restrictions on a waiver of counsel, to our mind, would make an effective relinquishment of representation exceedingly rare.

We have purposely endeavored to cover the background of law applicable to the case at bar, and to the cases accompanying it, before outlining the usually preliminarily stated facts. We now come to those facts.

Arthur Bruno, the relator in the instant case, now 49, and in trouble since he was 9, pleaded guilty more than a score of years ago, on April 21, 1942, to 8 indictments for a series of burglaries. The trial judge, the Hon. John A. Mawhinney, is now deceased. So is the prosecutor, Assistant District Attorney Charles C. Gordon. Bruno had no attorney. He did not ask for one. He was not offered one or told he might have one if he wished. We are justified in finding he was indigent; he was already in jail under a prior sentence of 10 to 20 years for a Delaware County burglary, and unless he had the proceeds of former misdeeds cached away, he hardly had enjoyed an opportunity to earn money to hire a lawyer. Asked by Mr. Gordon whether he had voluntarily pleaded guilty to all the indictments, he replied that he had. Judge Mawhinney imposed a sentence of 7½ to 15 years to begin on expiration of the term he was serving.

On October 30, 1959, he came before the Hon. Charles A. Waters, of Common Pleas Court No. 3, on a petition for habeas corpus. His complaint was that his guilty plea had been induced by someone's promise of leniency. Again he had no attorney; he signified his

willingness to proceed without one. Judge Waters dismissed his petition.

Then followed the landmark decision of Gideon v. Wainwright. Bruno promptly took new heart. With the uncompensated aid of the highly competent former Montgomery County Judge Morris Gerber and a Philadelphia attorney, he renewed his effort to obtain a habeas corpus. The district attorney answered, asserting a waiver of trial counsel and denying the retroactive effect of Gideon. The respondent also answered, setting forth merely the sentence record. We held a hearing at which the relator testified, under questioning by his attorney and by an assistant from the district attorney's office.

Gideon, as we have seen, is retroactive. Bruno, we believe, was indigent. He was charged with several felonies. He clearly was entitled to counsel at his trial under Gideon. Did he effectively waive representation?

He was an old hand at crime, with at least a dozen years of misconduct behind him when he was tried in 1942. He was familiar with the ways of criminals and the procedure of criminal courts. He did not ask for counsel when he pleaded guilty. His assertion that his plea was made on a promise of leniency is unsupported by evidence other than his own word. Neither the trial judge nor the prosecutor is alive to answer him.

Nevertheless, it remains true that he was not offered representation, and that he apparently was indigent, and we cannot conclude that when he pleaded guilty without asking for counsel he had the broad understanding of pertinent factors laid down by our State Supreme Court as essential to a waiver. He certainly did not expressly waive representation; the point simply did not come up, and under the law of the time no reason existed for it to be raised. Nevertheless, we cannot find that his plea without counsel was impliedly tantamount to a waiver.

One cannot be unmindful of all that has been explored and evaluated in terms of Gideon's reverberations. Illustrative is the August 1964 Journal of the American Judicature Society, which summarizes the survey and approaches of the American Bar Association, under the heading "Action Urged to Improve Facilities for Defense of Indigent Defendants".

One of the difficulties that arise is the constant emphasis on the word "indigent". Defendants who have tied themselves to the Gideon kite have been in the jailhouses in most instances for a considerable time and, naturally, all or almost all of them qualify as indigent. It is our belief that this situation should have been treated in terms of actuality and in the interest of protecting the almost 200,000,000 law-abiding inhabitants of the United States.

This court, regardless of its private beliefs, must follow the mandates and decisions of the Supreme Court of the United States, and is doing so in the instant case. We are constrained, however, to recall the statement of Mr. Justice David Josiah Brewer in his Lincoln's Day address in the year 1898, when he said: "It is a mistake to suppose that the Supreme Court is either honored or helped by being spoken of as beyond criticism. On the contrary . . . its judgments (should be) subject to the freest criticism."

For our right to disclose frankly our disagreement with the rationale of Gideon, we cite the Supreme Court itself. More than 20 years ago Mr. Justice Hugo L. Black declared: "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prize American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably

engender resentment, suspicion, and contempt much more than it would enhance respect": Bridges v. California, 314 U. S. 252, 270-271 (1941).

And the words of a great judge, Mr. Justice Oliver Wendell Holmes, spoken in 1897 while he was a member of the Supreme Judicial Court of Massachusetts, mirror our present view with striking precision: "I trust that no one will understand me to be speaking with disrespect of the law, because I criticise it so freely. I venerate the law, and especially our system of law, as one of the vastest products of the human mind. . . . But one may criticise even what one reveres": "The Path of the Law," an address delivered at Boston and reprinted in 10 Harvard Law Review 457, at page 473 (March 1897).

In safeguarding the privileges of accused criminals, we should preserve also in their constitutional guarantees and protection the rights and liberties of the law-abiding citizens of our country. Our concern is that the latter rights and liberties now not only have been frayed, but perhaps have been whittled away, in the tremendous overturn of settled and ingrained decisions.

All that one can hope is that expressions such as those in this opinion will be joined by others and that the cumulative weight of the objective reactions and views of thinking people will start swinging the pendulum back somewhat to what might be deemed normality in the area of protected living in the United States of America.

In the current state of the law, we are compelled to grant the relator's petition for habeas corpus and order a new trial on all bills of indictment, though not in any sense on the asserted assurance that he would receive leniency, and to set aside the pleas of guilty on bills 382 to 389 of April sessions, 1942, and the sentences imposed thereon.

Accordingly, we enter the following:

268

ORDER

And now, to wit, September 14, 1964, the petition for writ of habeas corpus is granted. The relator's pleas of guilty and the sentence of the court rendered April 21, 1942, on bills 382 to 389, inclusive, of April sessions, 1942, are hereby set aside and vacated, and a new trial on all said bills of indictment is hereby granted.